Filed 4/8/26  In re J.O. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re J.O., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D087009 |
| Plaintiff and Respondent, | (Super. Ct. No. SJ10843F) |
| v. | |
| E.O., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Daniela A. Reali-Ferrari, Judge.  Affirmed.

Caitlin E. Howard, under appointment by the Court of Appeal, for Defendant and Appellant.

Damon M. Brown, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Katie Abajian, Deputy County Counsel, for Plaintiff and Respondent.

E.O.'s (Mother) 14-year-old-son J.O. (Child) is nonverbal and low functioning with multiple mental health diagnoses, including autism spectrum disorder. Over the course of a year, Mother took Child to the emergency room 14 times for psychiatric issues. During those visits, doctors referred Child to outpatient services, but she did not follow up with those services.

On one such visit on July 6, 2025, Mother took Child to the emergency room after he refused to take his medication, broke a window in the van where they lived, and hit Mother in the head with a glass bottle. Mother left him at the hospital and did not return. Three days later, she tested positive for methamphetamine. Child remained in the hospital until July 15, at which time he was transferred to Polinsky Children's Center (PCC).

Based on this incident, the San Diego County Health and Human Services Agency (Agency) filed a dependency petition on Child's behalf under Welfare and Institutions Code[1] section 300, subdivision (b)(1)(A) and (C).

Mother quickly began a substance abuse program and a parenting program and secured housing. After one additional positive test on July 21, 2025, she consistently tested negative for methamphetamine.

At the jurisdiction and disposition hearing in October 2025, the juvenile court found by a preponderance of evidence that Child was a person described by section 300, subdivision (b)(1) and by clear and convincing evidence that removal from Mother's custody was proper under section 361, subdivision (c)(1). Mother appeals, contending the juvenile court erred as to both its jurisdictional and dispositional orders.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

We conclude substantial evidence supports the juvenile court's jurisdictional and dispositional orders and therefore affirm.

BACKGROUND

A.    *Events Leading to the Petition*

Child has diagnoses of nonverbal autism spectrum disorder, intermittent explosive disorder, and intellectual deficit and is described as low-functioning.  On July 6, 2025, Mother took Child to the hospital after he refused to take his regular medication, broke a window in the van where they were living, and hit her in the head with a glass bottle.  Clinicians gave him medication for agitation.  Initially, Child refused to take his regular medication at the hospital, but he later took it willingly.

Mother left Child at the hospital that night, stating she would return in the morning.  She left her phone at the hospital and did not return, resulting in the hospital being unable to reach her when Child was ready for discharge on July 7, 2025.  Child was admitted to the inpatient psychiatric unit due to Mother's absence and the lack of appropriate outpatient supports.

Following Child's admission to the inpatient psychiatric unit, the Agency began investigating a report of suspected child abuse or neglect. Mother had a history of taking Child to the hospital and leaving him, resulting in concerns that she was unable to properly care for him.  During prior hospital visits, Child was referred to services, but Mother had not followed through with those services and outpatient appointments.  Maternal grandparents were concerned Mother was using methamphetamine based on their experience with her past disappearances, but they were not sure. Maternal stepgrandmother was additionally concerned that Mother may have used methamphetamine in front of Child.  Witnesses reported Mother appeared to be under the influence on July 7, 2025.

3

On July 8, 2025, Mother told the Agency she did not return to the hospital because she slept late, her car would not start, and police stopped her at the park for being under the influence. She admitted she smoked marijuana the previous day but denied using any other drugs. She said she received substance abuse treatment for her use of crystal meth in the past, admitting her most recent use was a couple of years earlier. Mother reported that she and Child had been homeless for five months and faced difficulty because Child makes loud noises, disturbing neighbors. They were living in a van, leading to concerns that she could not provide the basic necessities for him. Mother stated she was offered shelter but could not take advantage of it until she could manage Child's behavior. Similarly, Mother asserted that she was turned away from services for her lack of an address, including support and services from the San Diego Regional Center (Regional Center).

Pursuant to the Agency's request, Mother submitted to a drug test on July 9, 2025, which was positive for methamphetamine and amphetamine.

On July 10, 2025, Child was ready to be discharged from the inpatient psychiatric unit, but it could not reach Mother. Dr. Hannah Sweet, a hospital psychiatrist, wrote a letter for the Agency noting serious concerns about Child returning to Mother's care because of Child's 14 visits to the emergency room in the past year, Mother's subsequent failure to follow through with obtaining services, and her difficulty consistently administering his medication. During Child's hospital visits, he was calm, causing Dr. Sweet to believe that Mother is a trigger for his episodes. Dr. Sweet emphasized the importance of Child receiving his medications at the proper time.

As of July 14, 2025, Child remained in the hospital and Mother had not visited him. The following day, Child was released from the hospital and entered PCC.

4

B.    *The Petition and Detention Hearing*

On July 14, 2025, the Agency filed a juvenile dependency petition on behalf of Child under section 300, subdivision (b)(1)(A) and (C) alleging: Mother failed to provide adequate medical treatment by failing to consistently administer Child's mental health medication; Mother was unable to control Child's aggressive behavior resulting in multiple emergency room visits and hospitalizations; and Mother tested positive for amphetamine and methamphetamine on July 9, 2025.[2]

In its accompanying report, the Agency noted:  Mother's struggles to consistently administer Child's medication led to aggressive behavior, resulting in numerous emergency room visits and difficulty finding housing; she failed to provide an adequate living environment sufficient to meet Child's basic needs, as they lived in a van cluttered with trash and other items; she failed to return to the hospital after bringing him there on July 6, 2025; and she previously failed to follow up with outpatient services recommended by the hospital, including outpatient psychiatry services and the Regional Center.  The Agency believed this demonstrated a lack of interest in and responsibility for Child and his needs.

Further, Mother had an extensive child welfare history involving concerns about substance abuse and a prior dependency case involving another child that ended in 2006 with Mother's loss of parental rights.  This history included 11 substantiated concerns between 1999 and 2024.  In one substantiated referral, Mother's teen daughter reported Mother used

_____

[2]    Child's father was not involved in his life, and Mother was unsure of his whereabouts.  The Agency diligently searched for him but was unable to contact the father.  He is not a party to this appeal.

5

methamphetamine in front of her. Mother also had a lengthy criminal history between 1995 and 2015, with many offenses involving illegal substances.

The juvenile court held a detention hearing on July 16, 2025. The court found the Agency stated a prima facie case in the petition and detention out of the parents' home was necessary for Child's welfare.

C.    *Post-detention Period*

In late July 2025, the Agency interviewed Mother. Mother explained that she previously requested the hospital provide Child's medication in liquid form, but it did not. But when Child was admitted to the hospital, he began receiving liquid medication. When he did not take his medication, Mother explained, Child was unable to control his emotions and became aggressive. She stated she used methamphetamine on a daily basis until she found out she was pregnant with Child, and she had been sober for 14 years. Child was exposed to methamphetamine for the first two months of the pregnancy. Consistent with her stated sobriety date, Mother initially denied using methamphetamine recently, describing the July 9, test results as a false positive. Later, she admitted to using methamphetamine. Because of her admitted relapse, she enrolled in a recovery program on July 21. She again tested positive for methamphetamine on that date.

Mother visited Child on July 26, 2025, at PCC. The visit went well, but Child had no difficulty separating when the visit ended.

Mother wanted Child to be placed with maternal grandfather, but he stated he was unable to meet Child's needs. Maternal grandfather was willing to act as a support system for Mother and Child.

As of August, Child remained at PCC with a full-time one-on-one residential care worker (RCW). The RCW reported that Child was overall

6

doing well at PCC and usually behaved. On some occasions, he became overstimulated and frustrated which he expressed, for example, by hitting the television and throwing things. Since his detention, the school reported fewer dysregulated behaviors, though he was suspended on one occasion for property destruction.

Between July and October 2025, the Agency made extensive efforts to find a home for Child but was unsuccessful.

The Agency's case plan for Mother included a parenting education program, substance abuse treatment, and testing for substance use. From July to October 2025, Mother attended substance abuse classes, made progress in the program, and tested negative for substances. She attended parenting classes where she did well; she paid attention and actively participated. She moved into a two-bedroom apartment, which she showed to the Agency. She visited Child three times a week. However, she left at least three visits early, at least once because Child was overstimulated.

D. *Jurisdiction and Disposition Hearing*

The juvenile court held a contested jurisdiction and disposition hearing on October 16, 2025. At the hearing, Mother called the Agency's social worker as a witness. The social worker acknowledged that Mother requested a form of medication other than a pill, and at PCC, Child now received liquid medication. Mother had successfully administered the liquid medication the day before the hearing. The social worker also acknowledged that Mother had quickly begun services, been compliant with the Agency, and found a home. She had completed at least five out of more than 20 parenting classes. Because of her progress, the social worker indicated the Agency would like to move to unsupervised visitation. The social worker stated Child had a tantrum during his visit, and he sometimes threw things while at PCC.

7

In its jurisdiction and disposition report and at the hearing, the Agency recommended the court make a true finding on the petition and Child remain placed out of Mother's home. The Agency remained concerned that Mother could not provide a safe environment for Child and properly administer his medication. This concern was based on hospital staff's concerns about Mother's ability to administer his medication, her failure to follow up with the services recommended by the hospital, and her recent and prior history of substance use. The Agency also pointed to Mother initially denying her July 2025 methamphetamine use and questioned her credibility regarding her sobriety for the prior 14 years. While commending Mother on her progress thus far, the Agency believed she was at the beginning of her journey after a long history and sought to continue working with her to ensure she could demonstrate the ability to meet Child's needs.

Child's attorney agreed with the Agency on jurisdiction and disposition, noting that being nonverbal, Child was highly vulnerable, lacked protective capacity, and needed a safe and sober parent and stable environment.

Mother contended that mere substance abuse is insufficient for jurisdiction and there was no causal connection between her two positive tests for methamphetamine and the risk of harm to Child based on his mental health issues. She argued the evidence showed Child continued the same behavior since detention.

The juvenile court sustained the petition and maintained Child's placement out of Mother's custody. As to jurisdiction, the court found by preponderance of evidence that Child was a person described by section 300, subdivision (b) based on the evidence that Mother brought Child to the emergency room 14 times to assist with his dysregulated behaviors and Mother failed to follow through with services. The court provided weight to

Dr. Sweet's letter, including the importance of Child receiving medication consistently. For its dispositional order, the court found there was clear and convincing evidence supporting the continued removal of Child from Mother's custody under section 361, subdivision (c). The court made this finding based on the evidence supporting jurisdiction along with the fact that Mother "has just started to address the protective issue," with three months of sobriety since testing positive at the beginning of the case after a years-long history of substance abuse. The court noted the concern that Mother might use methamphetamine in front of Child. The court also considered the high needs of Child and inability to report safety concerns. And the court relied on Mother still having only supervised visitation, her leaving visits early based on the behavior of Child, and her just beginning to take part in administering Child's medicine again. The court ordered liberal structured unsupervised visitation for Mother at PCC with the Agency having discretion to expand those visits.

## DISCUSSION

Mother contends the juvenile court erred by finding substantial evidence for both its jurisdiction order and disposition order. We disagree with both claims.

A.  *Jurisdiction*

"At the jurisdictional hearing, the court considers only the question whether the child is described by one or more subdivisions in section 300." (*In re D.B.* (2018) 26 Cal.App.5th 320, 327.) Under section 300, subdivision (b)(1), a child "is within the jurisdiction of the juvenile court" when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of" specified failures or inabilities of the parent. As is relevant here, that harm must be "as a

9

result of . . . [t]he failure or inability of the child's parent or guardian to adequately supervise or protect the child" (§ 300, subd. (b)(1)(A)) or as a result of "[t]he willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment" (§ 300, subd. (b)(1)(C)).  Courts have summarized this section as requiring three elements:  (1) a specified failure or inability of the parent, (2) causation, and (3) actual or a substantial risk of serious harm or illness.  (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561.)  However, the harm or risk of harm need not be due to the fault of the parent.  (*In re R.T.* (2017) 3 Cal.5th 622, 632.)  And while the harm or risk of harm must exist at the time of the jurisdictional hearing, the court may consider past events if there is reason to believe the conduct will reoccur.  (*In re L.B.* (2023) 88 Cal.App.5th 402, 411.)  A jurisdictional finding requires proof by a preponderance of evidence.  (§ 355, subd. (a).)

" 'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them.  [Citation.]  In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' " (*In re R.T., supra*, 3 Cal.5th at p. 633.)  " 'The parent has the burden on appeal of showing there is insufficient evidence to support the juvenile court's order.' " (*In re L.B., supra*, 88 Cal.App.5th at p. 412.)

Mother contends the Agency did not establish inadequate conduct, causation, and harm or risk of harm.  We conclude she failed to carry her

10

burden of establishing insufficient evidence of a substantial risk of harm caused by her failure or inability to supervise or protect Child.

Based on the circumstances as a whole, the juvenile court reasonably concluded that Mother failed or was unable to protect Child resulting in a substantial risk of serious harm to him, especially given his particular medical needs. Child's doctors were concerned that Mother could not properly care for him because of his many emergency room visits, her failure to follow up on services recommended during prior visits, and her inability to consistently administer his medication. Mother failed to take Child to outpatient psychiatry services, as recommended by his healthcare providers, instead waiting for a crisis and relying on emergency services. After bringing him to the emergency room on July 6, 2025, she did not return the next day, resulting in Child's admission. Mother did not visit Child during his stay between July 7, 2025, and July 15, 2025, where she could have observed and practiced administering his medication. Nor could the hospital reach her on multiple occasions, including July 7, 2025, and July 10, 2025, when Child was ready to be discharged, resulting in his admission being extended. Meanwhile, Mother tested positive for methamphetamine three days after bringing him to the hospital and again about two weeks later.

Mother contends Child's behaviors were caused by his health conditions and were not the result of her failure or inability to supervise or protect him. The court is sympathetic to the difficulties of caring for Child based on his unique needs. But under *In re R.T.*, Mother cannot simply blame Child's particularly challenging behavior to avoid a jurisdictional finding. (*In re R.T., supra*, 3 Cal.5th at p. 634.) And the record contains specific evidence that Mother's conduct resulted in a risk of harm to Child—her failure to follow up with outpatient services, her being unavailable when Child was

11

ready for discharge from the hospital, her absence from the hospital during his treatment, and her use of methamphetamine during that time.

Mother also argues that the risk of harm no longer existed by the time of the jurisdiction hearing. To her credit, Mother obtained an apartment, began substance abuse treatment and parenting classes, and tested negative for substances. While Mother progressed during this short period, the juvenile court reasonably concluded the risk remained given her longer history of failing to obtain outpatient services for Child and taking him to the hospital and leaving him there. Mother also had an extensive child welfare history, with 11 substantiated allegations, and a long history of methamphetamine use, including criminal charges. In one prior child welfare case, Mother's teen daughter reported Mother used methamphetamine in front of her, a concern maternal stepgrandmother raised here. And, contrary to Mother's statement in her opening brief that she had been sober for 14 years prior to this case, she disclosed to the Agency that she used drugs a couple of years before.

In this case, as the juvenile court noted, Mother was early in the process and had not yet demonstrated the ability to meet all of Child's needs. When visits with Child became difficult, Mother ended them early, providing a reason to believe she still may have been unable to adequately supervise or protect him if he experienced a violent outburst, becoming a danger to himself and others. The social worker estimated Mother had completed only one-quarter of her parenting classes. She administered Child's medication only once since the case began, and she had not yet progressed to unsupervised visits with Child. Viewing this evidence as a whole, there was substantial evidence at the time of the jurisdiction hearing such that a

reasonable court could conclude Child was a person described by section 300, subdivision (b)(1)(A).

Because we conclude there was substantial evidence to establish jurisdiction under section 300, subdivision (b)(1)(A), we do not consider the adequacy of evidence to establish jurisdiction under section 300, subdivision (b)(1)(C).

B.    *Disposition*

At the dispositional hearing, the court removed Child from Mother's custody under section 361, subdivision (c)(1). That section permits removal of a child from a parent's custody only when there is clear and convincing evidence of "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re D.B., supra*, 26 Cal.App.5th at p. 328.) "The court may consider a parent's past conduct as well as present circumstances." (*In re N.M.* (2011) 197 Cal.App.4th 159, 170.)

Like jurisdictional orders, we review dispositional orders for substantial evidence. (*In re R.T., supra*, 3 Cal.5th at p. 633.) Here, we must consider the heightened burden of proof. (*In re A.E.* (2014) 228 Cal.App.4th 820, 826.) "[W]hen presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made

13

the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)

Mother contends the risk to Child was minimal and could be addressed through reasonable monitoring and supervision of him in her custody. We conclude otherwise.

The same evidence supporting the juvenile court's jurisdictional finding supported the heightened standard for the court's disposition order, and the court reasonably concluded there was clear and convincing evidence of a substantial danger to the physical health, safety, protection, or physical or emotional well-being of Child. This evidence included Mother's history of substance abuse and child welfare cases; her repeatedly bringing Child to the emergency room but not following up with outpatient psychiatry and other services; her leaving Child at the emergency room on July 6, 2025; and her testing positive for methamphetamine three days later. Despite her engagement in services, at the time of the hearing, she had completed only a fraction of her classes, she had only participated in supervised visits, and her visits suggested she could not yet handle Child's challenging behaviors. Child's high needs and inability to communicate concerns dictated caution. The court is hopeful that these circumstances will have changed by the time of the next hearing, but the evidence supported the court's dispositional order at the time of the October 2025 hearing.

These facts are unlike those in *In re Henry V.* (2004) 119 Cal.App.4th 522, 529–530, where the dispositional finding was based on a single incident and there was no indication in the record that the court considered the clear and convincing standard. In this case, Mother had a history of methamphetamine use, child welfare referrals, and inability to handle this Child, and the juvenile court specifically ruled based on the clear and

14

convincing standard. Nor is this case like *In re M.V.* (2022) 78 Cal.App.5th 944, 962–964, where the social worker testified it was safe to return the children to the father when the issue originated with mother's domestic violence, and the Agency could require the mother to move out of the home. Contrary to Mother's argument, the social worker's testimony here that Mother had engaged in—but not yet completed—all recommended services is not equivalent to the testimony by the social worker that she could not think of any safety risk placing the children with the father. (*Id.* at p. 956.)

The juvenile court also reasonably concluded the record included clear and convincing evidence that there were no reasonable alternative means to protect Child aside from removing him from Mother's custody. The Agency considered relying on assistance from maternal grandfather. Although he was willing to be a support, he stated he was unable to care for Child due to his behavior, maternal grandfather had a heart condition, and Mother and Child could not live with him because it would create risk for a three-year-old-child who lived in his home. Many other alternatives, including unannounced visits and improving Child's ability to communicate, would not resolve concerns over Mother's ability to consistently administer Child's medication, follow up on his outpatient services, and protect him when he became upset, rather than relying on emergency services after an incident. It was reasonable for the court to determine returning Child to Mother's custody would be safe for him only after she completed more services, progressed to successful unsupervised visits, and demonstrated over a longer period the consistency and stability required to care for this complex Child.

Mother failed to raise California Rules of Court, rule 5.690(a)(1)(B)(i) in her opening brief. Consequently, we do not consider that argument. (*Aptos Council v. County of Santa Cruz* (2017) 10 Cal.App.5th 266, 296, fn. 7.)

15

DISPOSITION

The jurisdictional and dispositional orders are affirmed.


McCONNELL, P. J.

WE CONCUR:


CASTILLO, J.


RUBIN, J.

16